UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEVIN R. LEWIS,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )   Case No. 4:10CV1131 FRB
                                   )
MICHAEL J. ASTRUE, Commissioner    )
of Social Security,                )
                                   )
          Defendant.               )

**MEMORANDUM AND ORDER**

        This cause is before the Court on plaintiff Kevin R. Lewis's appeal of an adverse ruling of the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I.  Procedural History**

        On October 13, 2006, plaintiff Kevin R. Lewis ("plaintiff") filed an application for Disability Insurance Benefits (also "DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (also "Act"), alleging disability beginning March 1, 2005. (Administrative Transcript ("Tr.") 131-35). Plaintiff's applications were initially denied, and he requested a hearing before an Administrative Law Judge (also "ALJ"), which was scheduled for July 13, 2009. (Tr. 114-19).

        Before plaintiff's administrative hearing, a Pre-Hearing

-1-

Conference was scheduled and held on February 10, 2009. (Tr. 96-101, 54-63). Plaintiff's counsel was present at the conference, but there was no testimony offered from plaintiff. The ALJ noted that it appeared that plaintiff's own handwriting appeared on Exhibit 13F, entitled "Medical Opinion Re: Ability To Do Work Related Activities (Physical)" from Anthony Anderson, M.D., which appears in the administrative transcript at pages 483-86. (Tr. 54-55). The ALJ also noted that, on four occasions, plaintiff's counsel had submitted medical records and included with them his own typewritten summations of the medical information. (Tr. 55-56). The ALJ noted that counsel had submitted the summations as doctor's medical records, when in fact they were counsel's summary, and counsel stated that he had created the documents for purposes of his own review, and had indicated thereon what he was doing. (Tr. 56). The ALJ stated that she had removed the summations from the doctor's medical records to eliminate confusion between the two. (Id.) These summations appear in the administrative transcript at pages 207 through 212. The ALJ and counsel then had the following exchange:

> Question (by the ALJ): Counsel, you've got a problem submitting medical evidence that's been completed by the claimant, and passed off as the doctor's opinion, when in fact, it's the claimant's opinion.
>
> Answer (by counsel): Well, I, I, I don't know that. I, I can not respond to that because I've not talked to the claimant about this, and have not, I've not even known this until you, until you're telling me it.
>
> (Tr. 56-57).

-2-

The ALJ instructed counsel to discuss the matter with plaintiff, which counsel did.  (Tr. 57-58).  Counsel returned and reported that plaintiff admitted that he himself had filled out a portion of Exhibit 13F without realizing that it would be the doctor's report, and that the doctor had apparently adopted it and submitted it as his report.  (Tr. 58).

The ALJ gave counsel three weeks to contact the doctor and clear up the confusion regarding whose opinion the report reflected.  (Id.)  The ALJ noted that plaintiff had a history of alcohol abuse and narcotic addiction, and instructed counsel to investigate whether plaintiff had ever received treatment or been arrested in conjunction therewith, and counsel agreed to do so.  (Tr. 59).  The ALJ also instructed counsel to determine whether plaintiff had filled out portions of any other medical records, and counsel agreed to do so.  (Tr. 61).  The ALJ noted that Exhibit 11E, generated by plaintiff's attorney (appearing at page 208 of the administrative transcript) "looks very, very much like a medical record."  (Tr. 63).  The ALJ expressed concern that the summations prepared by counsel looked so much like actual medical records that others reviewing plaintiff's case may have failed to realize that they were not actual medical records.  (Tr. 62).

Plaintiff's administrative hearing was held on July 13, 2009.  (Tr. 27-63).  On July 31, 2009, the ALJ issued a decision denying plaintiff's claim.  (Tr. 11-26).  Plaintiff sought review from defendant agency's Appeals Council which, on May 17, 2010, denied his request for review.  (Tr. 1-4).  In so doing, the

-3-

Appeals Council noted that it had received and considered additional evidence, including a brief from plaintiff's counsel, and medical records from Washington University dated October 20, 2009. (Tr. 2, 4). The ALJ's determination stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

### A.  Plaintiff's Testimony

During Plaintiff's administrative hearing, he responded to questions from the ALJ and from his attorney. Plaintiff testified that he lived in a house with his mother, age 73. (Tr. 30). He weighed 360 pounds. (Tr. 33). Plaintiff completed the twelfth grade, and additional training as a plumber's laborer. (Tr. 30). He received unemployment benefits in 1985, and workers' compensation benefits in 1999 following a knee injury. (Tr. 31). He stated that he last had alcohol two months ago, and denied ever participating in rehabilitation or alcohol treatment programs. (Tr. 32).

Plaintiff testified that he had worked for 20 years for Ed Bellum Plumbing, and stopped working in 2005. (Id.) Before working for Ed Bellum Plumbing, plaintiff worked as a drywall hanger for 12 to 18 months. (Id.)

Plaintiff testified that he had undergone a RACZ procedure, which he described as an injection to numb his sciatic nerve. (Tr. 37). He testified that he had been offered a spinal cord stimulation procedure to help with back pain, but he had not

-4-

yet had the procedure.  (Tr. 39).  When asked why he had not
availed himself of the procedure, plaintiff stated, "[m]oney
reasons.  I can't afford it."  (Id.)  Plaintiff testified that his
insurance company would pay for 80% of the procedure, but that he
could not afford to pay the other 20%.  (Tr. 39).  When asked,
plaintiff stated that he did not know how expensive the procedure
would be.  (Id.)

The ALJ noted that medical records dated June 19, 2009
indicated that plaintiff had been out walking for three hours, and
plaintiff acknowledged this, stating that he had attended a
festival in a park, but stated that he had taken frequent breaks
while walking, and had spent the "next two or three days" in bed.
(Tr. 41).  When asked to describe his everyday activities,
plaintiff testified that he generally stayed home, sat up for a
little bit to watch television, and then laid down for a while to
watch television.  (Id.)  He stated that he may read the paper at
the table until he needed to lie down again.  (Id.)  He testified
that he could sit for 15 to 30 minutes before needing to get up and
move around or stretch his back.  (Tr. 42).  Plaintiff testified
that he had been this way since injuring his back in 2004.  (Id.)
The ALJ noted that plaintiff told his doctors he could drive for
three to four hours at a time, and plaintiff replied that he
"wouldn't be able to drive that now.  I mean I have good days,
Judge, I'm not - - you know I might have one good day out of a
week, but if I do drive three or four hours I'm generally in bed
the next day or the next two days."  (Id.)  He stated that today,

he could drive for 30 to 45 minutes before having to stop and get out of the car. (Tr. 43). Plaintiff testified that he could stand for 30 to 45 minutes, and could walk only in intervals due to pain, explaining that after walking "a certain amount of time my back starts hurting, and then it goes down into my thighs, and especially on my right side, it'll go down past my knee into my calf." (Id.) He stated that he limped, and had used a cane on occasion since 2005. (Tr. 43-44).

Plaintiff testified that he socialized on the telephone with friends, and had been dating a woman for a year. (Tr. 44). He stated that his girlfriend was a nurse, and helped him by using massage and Icy Hot treatments for his pain, and by keeping records related to his diabetes and sleep apnea. (Tr. 44-45). Plaintiff testified that he could walk without rest for 15 to 30 minutes, and could sit and stand for 30 minutes. (Tr. 46).

Plaintiff's attorney then renewed the subject of plaintiff's activities of daily living. Plaintiff testified that, generally, he spent most of his time at home in bed, and that "maybe once every couple of weeks I might try to get out of the house for a little while, but it's - - I mean it's nothing. Like I use to [sic] play softball, I use to [sic] golf, I use to [sic] do a lot of activities like that, that I can't do any more. But on a basic average day I'm at home pretty much lying, lying flat on my back watching TV most of the time." (Tr. 46-47). Plaintiff testified that if he tried to do more, his pain increased and he spent the next "two to three to four" days in bed, "[a]nd then

-6-

after that, the effects generally linger for a couple of weeks." (Tr. 47). Plaintiff described "overexertion" as extended walking or being in one position, and stated that he was now unable to do things (such as change a tire on a car) that he used to do for himself, explaining that if he did anything like that, "it'll set my back off, my back and my legs. And then, then I'm in bed for a few days." (Id.) He stated that he could lift "10, 15, 20 pounds" just once. (Id.)

Plaintiff testified that he saw a psychologist in May of 2008, but had not received any type of counseling or therapy, or taken any psychiatric medication, before or since. (Tr. 48). He stated that he saw the counselor because his attorney suggested that he do so because he had not been as happy or as outgoing as he had previously been, and his attorney was afraid that plaintiff was "starting to kind of withdraw and maybe become depressed." (Id.)

   B.   Medical Records

Records from Albanna Neurosurgical Consultants, PC, indicate that plaintiff saw neurosurgeon Faisal J. Albanna, M.D., F.A.C.S., on February 9, 2005 with complaints of a sudden onset of low back pain radiating to his right hip, buttock, thigh, and right knee while lifting furniture in December. (Tr. 373). Upon examination, Dr. Albanna noted that plaintiff's gait and station were full and steady; he had full range of motion in the lumbar spine; he had full muscle strength and intact sensation; and straight leg raise testing was negative bilaterally. (Id.) MRI revealed extensive lipomatosis with mild stenosis and bulging discs

and questionable right lateral disc protrusion at L3-4, and x-rays were unremarkable. (Id.) Plaintiff was treated with steroid injections. (Id.)

Records from St. John's Mercy Medical Center indicate that plaintiff was seen on April 8, 2005 with complaints of right leg pain and back pain. (Tr. 240). Plaintiff reported that epidural injections had provided good relief, but he had experienced a recurrence of symptoms and was currently taking Percocet[1] and Neurontin[2] which had been prescribed for him to use on an as-needed basis. (Id.) Plaintiff reported drinking socially, and it was noted that he was six feet tall and weighed 360 pounds. (Id.) Upon examination, it was noted that he appeared to be in no distress, and had decreased sensation in L3-4, but normal sensation from C2-S1. (Id.) Plaintiff had full strength, and 2/4 reflexes. (Tr. 240). It was noted plaintiff was obese. (Id.) Myelogram revealed severe stenosis at L2, L3 and L4. (Tr. 240-41). Lumbar laminectomy was recommended. (Tr. 241).

Records from Microsurgery and Brain Research Institute, P.C., the office of Paul H. Young, M.D., reveals that plaintiff was seen on April 13, 2005 for a second opinion, and complained of moderate lumbar pain which began four months ago. (Tr. 244).

---

[1]Percocet, or Acetaminophen with Oxycodone, is used to relieve moderate to moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601007.html

[2]Neurontin, also known as Gabapentin, is used to help control certain types of seizures in patients who have epilepsy. It is also used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles).
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

Plaintiff was taking Percocet, Flexeril,[3] and Neurontin, and it was noted that he consumed alcohol in moderate amounts. (Id.)  Upon examination, plaintiff had no tenderness of the spine, ribs, or SI joints; his movement was moderately restricted in all directions; and he had normal stability, strength and tone. (Id.)  He had no instability in his hip, knee or ankle; had normal muscle strength of the major groups; and had normal muscle tone and bulk. (Tr. 245).  Deep tendon reflexes were normal, and straight leg raise testing was negative. (Id.)  Dr. Young noted that plaintiff's myelogram revealed moderate disc herniation at L3-4, and recommended lumbar decompression. (Tr. 246).

Plaintiff returned to Dr. Albanna on April 26, 2005 and stated that the injections had not helped. (Tr. 372).  Lumbar myelogram with a post-myelogram CT revealed a right herniated disc at L3-L4, degenerative disc disease, and lumbago. (Id.)  Dr. Albanna noted that he explained to plaintiff that the best surgical option was a microdiscectomy at L3-L4, with the understanding that this could prompt a future surgery, and plaintiff agreed to proceed. (Tr. 372).  Dr. Albanna performed right L3-L4 microdiscectomy at Des Peres Hospital on May 6, 2005. (Tr. 432-33).

On May 31, 2005, plaintiff returned to Dr. Albanna and reported continuing left hip and groin pain, which was different

---

[3]Flexeril, or Cyclobenzaprine, is a muscle relaxant used to relax muscles and relieve pain caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682514.html

from his pre-operative complaints.   (Tr. 371).   Examination revealed negative straight leg raise testing, full muscle strength, intact sensation, and slow but steady gait.   (Id.)  Dr. Albanna referred plaintiff for physical therapy and advised he take Neurontin, Lodine,[4] Flexeril, and Percocet.   (Id.)

On June 22, 2005, plaintiff saw Dr. Albanna with only slightly improved right hip, right groin, and anterior thigh pain. (Tr. 369).  MRI revealed postoperative changes, but no discitis or collection.   (Id.)  Physical therapy was discontinued, plaintiff's medications were adjusted, and he was given a lumbosacral corset. (Id.)

Medical records from Des Peres Hospital reveal that plaintiff was seen by Alexander Beyzer, M.D. on July 31, 2005 with complaints of some back pain and left leg weakness, and stated that he had been doing well until recently, when he began falling.  (Tr. 275).  Upon examination, Dr. Beyzer noted that plaintiff was in no distress, and was "moderately severely morbidly obese" at 320 pounds.  (Id.)  Plaintiff was tender over the lumbosacral area with diminished range of motion, but straight leg raise testing, external and internal rotation, and knee examination were all normal.  (Id.)  Plaintiff was alert and oriented; had normal muscle tone and strength, but diminished reflexes.  (Id.)  Dr. Beyzer recommended additional evaluation of plaintiff's lumbosacral MRI,

---

[4]Lodine, also called Etodolac, is a non-steroidal anti-inflammatory medication used to relieve pain, tenderness, swelling, and stiffness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692015.html

-10-

and physical and occupational therapy in addition to pain control medications.  (Tr. 275-76).   X-rays performed on July 29, 2005 revealed a negative left shoulder, mild degenerative changes of the lumbar spine, and a negative cervical spine.  (Tr. 287-289).

On August 1, 2005, plaintiff was seen by Danuta M. Zukowska, M.D., with complaints of back pain secondary to a recent fall.  (Tr. 277).   Upon examination, plaintiff was noted to be alert, oriented and pleasant, with no tenderness over the lumbar region, but right lower extremity raising was diminished on the left.  (Id.)  Plaintiff was given Toradol IV,[5] Soma[6] and Percocet for pain, and physical therapy was recommended.  (Tr. 278).   Lumbar spine CT scan performed on August 2, 2005 revealed mild central disk protrusion at L5-S1, diffuse disk bulge at L4-5, and possible mild spinal stenosis at L2-3.  (Tr. 279-80).   Lumbar myelography performed on this date revealed no evidence of disk herniation or myelographic block, (Tr. 283), and a post-myelogram lumbar CT scan performed on this date revealed abnormal L3-4 disk space and a developmentally small canal throughout the lumbar spine with a small central protrusion at L5-S1 and some stenosis at L2-3. (Tr. 281-82).  Plaintiff was discharged in stable condition on August 3, 2005 with discharge diagnoses of lower extremity weakness and hypertension.  (Tr. 274).   He was instructed to follow up with his

---

[5]Toradol, or Ketorolac, is used on a temporary basis to relieve moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a693001.html

[6]Soma or Carisoprodol, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682578.html

primary care physician, seek pain management, and do outpatient
physical therapy.   (Id.)   He was given Soma, Toradol, and
Neurontin.  (Id.)

On August 25, 2005, plaintiff returned to Dr. Albanna's
office and saw Alexander Beyzer, M.D., who noted plaintiff's
hospitalization.   (Tr. 368).   Plaintiff reported that he had
improved strength and less pain, but that his pain was aggravated
by prolonged standing.  (Id.)  Upon examination, Dr. Beyzer noted
that plaintiff had lost a substantial amount of weight.  (Id.)
Plaintiff was non-tender over the lumbosacral spine, but had
diminished range of motion and used a walker.  (Id.)  Dr. Beyzer
recommended plaintiff continue to lose weight and start
chiropractic treatment, and to do strengthening exercises.  (Tr.
368).  He returned on September 1, 2005 with complaints related to
a skin infection.  (Tr. 367).

On September 8, 2005, plaintiff was seen by Srinivasan
Raghavan, M.D. for pain management, and complained of low back and
hip pain, and stated that physical therapy had been helping
marginally.  (Tr. 299).  Dr. Raghavan noted that plaintiff was very
uncomfortable initially "as he had to walk a fair distance, but
subsequently he settled down."  (Id.)  Dr. Raghavan noted that
plaintiff worked in construction.  (Id.)  Plaintiff was started on
OxyContin.[7]  (Tr. 298).

On October 3, 2005, plaintiff saw Dr. Beyzer and reported

---

[7]OxyContin is used to relieve moderate to severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html

-12-

significantly improved hip symptoms, and it was noted that he had lost sixty pounds. (Tr. 366). Upon examination, plaintiff was moderately obese, and had no tenderness and negative straight leg raise testing. (Id.) His range of motion was diminished, but hip rotation was within normal limits. (Id.) Plaintiff was advised to continue seeing the chiropractor and start active physical therapy. (Id.)

On November 11, 2005, plaintiff was seen by Sandra S. Hoffmann, M.D. for an injection, stating that he had undergone disc surgery and had initially been well, but then began to have more pain down his right leg. (Id.) It was noted that plaintiff had seen Dr. Planso for chiropractic care and had noticed improvement, but sought an injection due to pain radiating down his right leg, and injection was performed. (Id.)

On November 14, 2005, plaintiff saw Dr. Beyzer and reported doing much better. (Tr. 365). Upon examination, Dr. Beyzer noted that plaintiff was in no distress, and had full range of motion, negative straight leg raise testing, normal muscle tone and strength, and diminished reflexes. (Id.) Dr. Beyzer noted that plaintiff used a cane only for stability. (Id.)

Plaintiff returned to Dr. Beyzer on December 14, 2005 and reported feeling much better, stating that he had been involved in acquatic physical therapy which helped "tremendously" in alleviating plaintiff's pain. (Tr. 364). Upon examination, plaintiff was non-tender; had limited range of motion; negative straight leg raise testing, and improved flexibility. (Id.)

-13-

Muscle tone and strength were normal and full, and plaintiff's sensation and gait were normal. (Id.)

Plaintiff returned to Dr. Beyzer on January 10, 2006. (Tr. 363). Plaintiff complained of a flare-up of back pain following a night of overactive sex on New Year's Eve. (Tr. 363). Plaintiff was taking Vicodin, Flexeril and Advil with some relief. (Id.) He reported difficulty walking. (Id.) Upon examination, Dr. Beyzer noted that plaintiff was tender across the lumbar area, and had limited range of motion and negative straight leg raise testing. (Id.) He had normal muscle tone and strength, and diminished reflexes. (Id.) Plaintiff was advised to use chiropractic treatment and continue aqua therapy and ice. (Id.) On January 30, 2006, plaintiff returned to Dr. Beyzer with the same complaints and history, and Dr. Beyzer diagnosed a lumbar sprain/strain, and performed a right lumbosacral trigger point injection. (Tr. 361-62). Plaintiff returned to Dr. Beyzer on February 14, 2006 with the same complaints and history, stating that he could not see a chiropractor due to severe pain. (Tr. 359). Dr. Beyzer performed an additional sacroiliac area injection. (Id.) On February 27, 2006, Dr. Beyzer noted that MRI revealed severe degenerative disc disease at L2-L3, L3-L4 with foraminal stenosis. (Tr. 358).

On March 14, 2006, plaintiff saw Dr. Albanna. (Tr. 357). Dr. Albanna noted that plaintiff had done well after his May 2005 microdiscectomy until New Year's Eve as described earlier, after which plaintiff experienced recurrent severe low back pain

-14-

characterized as a 10 on a 1-10 scale. (Id.) Plaintiff reported being unable to sit, stand or lay in bed. (Id.) Plaintiff was disinclined to pursue any conservative treatment, and he and Dr. Albanna discussed surgery. (Id.)

On March 31, 2006, plaintiff was admitted to Des Peres Hospital and Dr. Albanna performed lumbar decompression and fusion with instrumentation. (Tr. 261-62, 270-71). Dr. Albanna noted that, when plaintiff was discharged on April 3, 2006, his x-rays showed a satisfactory fusion in good condition. (Tr. 260).

Plaintiff returned to Dr. Raghavan on April 7, 2006 for follow-up of hypertension, and reported that he had been taking Toprol[8] with no problems. (Tr. 297). Dr. Raghavan noted that plaintiff was obese and pleasant with no swelling in his extremities, and continued him on Toprol. (Id.)

On April 28, 2006, plaintiff saw Dr. Albanna and reported doing very well overall. (Tr. 355). Plaintiff's transition from sitting to standing remained painful, but once he was up, he was better. (Id.) Plaintiff's right leg was still numb, but his left lower extremity pain was considerably better. (Id.) Sensory and motor examinations were intact. (Id.) Physical therapy was recommended. (Tr. 355).

Plaintiff returned to Dr. Raghavan on May 23, 2006 with complaints related to his surgical wound, for which he had been taking an antibiotic. (Tr. 296). Plaintiff reported that he had

---

[8]Toprol XL, or Metoprolol, is used to treat hypertension. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682864.html

stopped taking Toprol and Valium, and rarely took Flexeril.  (Id.)
It was noted that the wound was not obviously infected, but
antibiotics were continued.  (Id.)

    Plaintiff returned to Dr. Albanna on June 6, 2006
reporting paresthesias involving both lower extremities.  (Tr.
354).  He was advised to continue therapy.  (Id.)

    Plaintiff returned to Dr. Raghavan for follow-up regarding the
wound on June 7, 2006.  (Tr. 295).  He was noted to be alert and
oriented, and testing revealed no infection.  (Id.)  Plaintiff
noted that his blood pressure was high, and he was advised to take
Toprol and lose weight.  (Id.)

    On July 18, 2006, plaintiff saw Dr. Albanna and reported
doing considerably better, and walking without support.  (Tr. 353).
He had slightly decreased range of motion of the lumbosacral spine,
and examination was otherwise normal.  (Id.)  Dr. Albanna then
discussed plaintiff's employment, using language in the present
tense. Specifically, Dr. Albanna wrote:

> He works as a laborer which is a high physical
> demand level.  I told him at the present time
> I do not think he can meet such a demand, but
> he can go back to work four hours a day with
> 15 pounds weight restriction to reflect his
> medical progress, which may not be obtainable
> per his employer.

(Tr. 353).

    Dr. Albanna recommended that plaintiff extend his
physical therapy by four weeks, and noted that it may take at least
one year before plaintiff could meet the high physical demands of

-16-

his job.    (<u>Id.</u>)    Dr. Albanna opined that plaintiff had the
alternative of moving to a more sedentary job, and wrote that he
and plaintiff had a lengthy discussion about that and that
plaintiff was aware.  (<u>Id.</u>)

On August 30, 2006, plaintiff saw Dr. Beyzer and reported
that he had some flare-up recently, which was getting better.  (Tr.
352).  He reported taking Flexeril, Vicodin, Neurontin and Toprol,
and stated that physical therapy was helping.  (<u>Id.</u>)  He was trying
to lose weight.  (<u>Id.</u>)  Upon examination, he was in no distress;
had limited range of motion; negative straight leg raise testing,
normal muscle tone and strength, intact sensation, and diminished
reflexes.  (<u>Id.</u>)  Dr. Beyzer recommended plaintiff continue weight
loss and return in one month.  (Tr. 352).

Plaintiff returned to Dr. Beyzer on September 28, 2006
with complaints of some discomfort in his left buttock.  (Tr. 351).
He reported difficulty returning to work as a plumber, and trouble
losing weight.  (<u>Id.</u>)  Upon examination, Dr. Beyzer noted that
palpation of the lumbar area was unremarkable, and that plaintiff
had limited range of motion with flexion and extension and negative
straight leg raise testing; normal muscle tone and strength; a
normal neurological examination; and normal sensation and
coordination, and a normal gait.  (<u>Id.</u>)  Dr. Beyzer recommended
chiropractic treatment and a home exercise program, and stated that
plaintiff would probably be unable to return to work as a plumber.
(<u>Id.</u>)  Dr. Beyzer noted that he provided plaintiff with information
for vocational rehabilitation.  (Tr. 351).

-17-

On July 18, 2006, plaintiff saw Dr. Raghavan with complaints related to hypertension and obesity. (Tr. 294). Plaintiff's Toprol dosage was increased, and he was given advice regarding diet and exercise. (Id.)

On August 30, 2006, plaintiff returned to Dr. Raghavan and stated that he had not been "a good boy" and had not been taking his Toprol regularly, but resumed four to five days ago. (Tr. 293). Upon examination, Dr. Raghavan noted that plaintiff was obese, pleasant, alert and oriented, and in no acute distress. (Id.) His Toprol was continued and he was advised to take Neurontin, Flexeril and Vicodin as needed for pain. (Id.)

On September 28, 2006, plaintiff saw Dr. Raghavan for follow up of hypertension, neuropathy and obesity. (Tr. 292). Plaintiff stated that he had not been as conscious of his weight as he should, explaining that he entered into barbecue contests. (Id.) Plaintiff stated that, overall, he was functioning okay. (Id.) Upon examination, Dr. Raghavan noted that plaintiff was morbidly obese and that his hypertension was "not well controlled." (Id.) Dr. Raghavan wrote that he told plaintiff "quite clearly" that he was morbidly obese and must control his weight, and that plaintiff promised to do so. (Id.)

Records from Total Rehab Concepts indicate that plaintiff underwent a course of physical therapy from April of 2006 through September 25, 2006. (Tr. 307-49). On June 2, plaintiff complained of a sudden onset of low back pain after lifting furniture, and complained of pain in his right hip and buttock with occasional

-18-

radiating pain into the right groin. (Tr. 347). On June 12, 2006, he felt like he was getting along pretty well, and stated that his number one goal was to play golf in the fall. (Tr. 326). On July 3, 2006, plaintiff reported having had a pretty active weekend, including playing washers. (Tr. 322). On July 5, he reported no new symptoms and occasional pain in his lower abdomen to the front of his groin, (Id.) and on July 20, 2006, he reported feeling pretty good. (Tr. 320). On July 24, he complained of soreness in his right lower back and hip, (Tr. 317), and on July 26, 2006, he reported "[y]esterday I had the best day I've had since my [symptoms]. I was stiff in the A.M. but once I started moving around I had no pain at all." (Id.) On July 28, 2006, he reported groin pain, and on July 31, 2006, he reported being at a barbecue all day on Saturday during which he did a lot of sitting and standing, and that when he returned home, he had soreness in his hips and the front of his legs. (Tr. 316). On August 8, 2006, he reported terrible cramping pains in his lower abdomen and shooting pain in his left hip, and on August 11, stated he was doing better. (Tr. 315). On September 8, 2006, plaintiff reported that his low back continued to feel better, and on September 12, he reported that he was sore after spending a lot of time on his feet. (Tr. 310).

On December 4, 2006, Herbert Waxman, M.D. prepared a case analysis. (Tr. 446). Dr. Waxman noted that the record contained conflicting evidence regarding plaintiff's gait and the need to alternate sitting and standing. (Id.) Dr. Waxman noted that the

field office observed on October 13, 2006 that plaintiff had
trouble standing and walking, but Dr. Beyzer had recorded a
completely normal neurological examination and normal gait on
September 28, 2006, just two weeks earlier. (Id.) Dr. Waxman
noted that plaintiff's reported activities of daily living were
consistent with standing and walking at least two hours in an
eight-hour day, but did not support the need to alternate sitting
and standing. (Id.) Dr. Waxman noted that plaintiff's reported
social activities included mostly sitting and talking, and going to
friends' children's games to watch, and that he did not allege the
need to alternate sitting and standing. (Tr. 446). Dr. Waxman
noted that Dr. Albanna had opined that plaintiff could move to a
sedentary job. (Id.) Dr. Waxman concluded that it appeared that
plaintiff could stand/walk at least two hours in an eight-hour
workday and sit for about six hours (with the usual breaks) without
the need to alternate sitting and standing, but that the conflict
in the medical evidence should be resolved. (Id.)

       On January 17, 2007, medical consultant C. A. Parker
completed a Physical Residual Functional Capacity Assessment. (Tr.
449-54). Consultant Parker opined that plaintiff could lift and/or
carry ten pounds and frequently lift and/or carry less than ten;
could stand and/or walk for a total of at least two hours in an
eight-hour day and sit for six, and push and/or pul without
limitation. (Tr. 450). Consultant Parker noted that plaintiff was
considering buying an elliptical device for weight reduction.
(Id.) Consultant Parker opined that plaintiff could occasionally

-20-

balance and kneel, but otherwise had no limitations.  (Tr. 452).
Consultant Parker opined that plaintiff had no manipulative,
visual, or communicative limitations, but should avoid concentrated
exposure to vibration and hazards.  (Tr. 452-53).

On March 27, 2007, plaintiff saw Dr. Raghavan for follow-
up, and it was noted that he was obese and hypertensive with some
back pain and lower extremity neuropathy.  (Tr. 494).   Upon
examination, plaintiff was alert and oriented.  (Id.)   His
examination was unremarkable.  (Id.)   Dr. Raghavan assessed
hypertension that could be better controlled, and he prescribed
Felodipine.[9]  (Id.)  On July 16, 2007, plaintiff complained of back
pain and requested an injection.  (Tr. 493).

On May 25, 2007, plaintiff saw Dr. Raghavan for a
detailed medical examination, stating that he wanted to get
disability.  (Tr. 492).  He was not working.  Plaintiff reported
drinking one drink per day, and sleeping five to seven hours a
night and waking up feeling rested but felt sleepy during the day.
(Id.)  He reported that friends told him he snored loudly.  (Id.)
He complained of some fatigue, hypertension, and shortness of
breath upon exertion which he attributed to his weight.  (Id.)
Examination was unremarkable with the exception of morbid obesity,
and plaintiff was found to be alert and oriented.  (Tr. 492).  Dr.
Raghavan opined that plaintiff had hypertension that would not
improve unless plaintiff lost weight.  (Tr. 491).   Dr. Raghavan

_____

[9]Felodipine is used to treat hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692016.html

-21-

opined that plaintiff should continue with pain medications as needed, and should lose weight.  (Id.)

On July 16, 2007, plaintiff saw Dr. Hoffman with complaints of severe back pain, stating that he had difficulty being in any position other than standing, and it was noted that he had difficulty sitting for the examination.  (Id.)  Upon examination, he was nontender, but Dr. Hoffmann could feel trigger points across the S1s and L4-5.  (Id.)  Plaintiff was treated with injections, and given Lidoderm[10] patches.  (Tr. 491).

Records from Pain Management Professions indicate that plaintiff saw Dr. Anderson, a pain management specialist, on August 30, 2007.  (Tr. 480).  Plaintiff complained of low back, hip, and groin pain.  (Id.)  He stated he had not worked since May of 2005.  (Id.)  He reported he slept four to seven hours per night, waking in the night to use the bathroom.  (Id.)  He stated that he had lost 30 to 45 pounds over the last six months, and that he did daily stretching and walked for 20 to 30 minutes per day.  (Tr. 480).  Plaintiff denied depression, anxiety, mood swings or sleep disorders.  (Tr. 481).  Dr. Anderson found him to be in no distress, and to ambulate without an assistive device.  (Id.)  Lumbar flexion and extension were limited by pain, and plaintiff was tender to palpation.  (Id.)  Muscle bulk and tone were normal, and plaintiff's joints showed normal range of motion.  (Id.)  On September 11, 2007, plaintiff underwent a RACZ procedure (an

_____

[10]Lidoderm (also called Lidocaine) patches are local anesthetics. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html

epidural injection procedure, in which a wire catheter is fed into the epidural space in order to eliminate scar tissue and deliver medicine). (Tr. 477-78).

On October 29, 2007, plaintiff called to cancel his follow-up appointment with Dr. Anderson, stating that he was doing fairly well and had initiated disability proceedings. (Tr. 476). Plaintiff's next contact with Dr. Anderson's office was on December 12, 2007, when he called to report a slow increase in his hip pain especially with sitting, and requested a refill of his Hydrocodone. (Tr. 475).

On January 22, 2008, Dr. Anderson performed another epidural injection procedure. (Tr. 474). Plaintiff's next contact with Dr. Anderson was nearly four months later, on May 6, 2008, when he called the office to request medication refills, and it was noted that he was not receiving medication from any other physician. (Tr. 472). Plaintiff was given a one-week refill of Lortab until he could be seen. (Tr. 471).

Also on May 6, 2008, plaintiff was seen by F. Timothy Leonberger, Ph.D., a Clinical Neuropsychologist, on referral from plaintiff's attorney. (Tr. 456-63). Dr. Leonberger noted that plaintiff had been "referred for a psychological evaluation in order to aid in determining possible disability due to allegations of back pain and depression." (Tr. 456). When Dr. Leonberger asked why plaintiff was unable to work a full-time job, plaintiff stated "I've have [sic] two big back surgeries and two smaller procedures to relieve the pain. But if I try to do anything for

-23-

more than an hour, whatever I try to do, I can't hardly get around." (Id.) Dr. Leonberger noted plaintiff's medical history, and also noted that plaintiff had never been seen by any mental health professionals for psychological or emotional problems. (Tr. 457). Plaintiff reported that, until three weeks before the evaluation, he drank a case of beer and half a bottle of hard liquor per week. (Id.) Plaintiff reported that he had quit previously in an effort to lose weight, not because he considered it a problem, and then resumed drinking. (Id.) Plaintiff reported two marriages and two divorces, and stated that he presently lived in a house with his mother. (Id.) He stated he stopped working in November of 2005 because he hurt his back. (Tr. 457). He stated that he occasionally volunteered at the Elk's Club office for one to two hours per day; tried to walk for short distances; limited his driving to three to four hours at a time. (Tr. 458). Plaintiff reported being unable to bend, lift heavy objects, or twist his body in any fashion, but could do light housekeeping, (Id.) He reported spending time with friends and with his girlfriend, and occasionally helping friends with barbecue competitions. (Id.) Upon examination, Dr. Leonberger noted that plaintiff was awake, alert and oriented, and displayed logical and sequential thinking. (Id.) Plaintiff described his mood as frustrated, and had adequate attention and concentration. (Tr. 458). He sat in a chair uncomfortably. (Id.) He described his sleep as "all over the board," explaining that some nights he was unable to sleep, while other times he fell asleep at 8:00 p.m.

(Tr. 459).  He complained that he always felt tired and fatigued. (Id.)

Dr. Leonberger opined that plaintiff had moderate to marked limitations in his activities of daily living; mild to moderate impairment in social functioning; marked impairment in terms of concentration, persistence and pace; and marked impairment in deterioration or decompensation in work or work-like setting. (Tr. 459-60).  Regarding the latter, Dr. Leonberger noted that plaintiff had primarily worked at heavy physical jobs and that, given his subjective experience of pain and depression, had a marked impairment in this area.  (Tr. 460).  Dr. Leonberger assessed plaintiff with dysthymic disorder, and opined that he had a Global Assessment of Functioning ("GAF") of 60.  (Tr. 459).  Dr. Leonberger opined that plaintiff had "marked" limitations in his ability to carry out complex instructions and "make judgments on complex work-related decisions," explaining that plaintiff had a "very high level of subjective pain as well as depression," and therefore could not carry out instructions "due to his subjective experience of pain."  (Tr. 461).  Dr. Leonberger opined that plaintiff had "moderate" limitations in his ability to carry out simple instructions and understand and remember complex instructions; "mild" limitations in his ability to "make judgments on simple work-related decisions," and no limitations in his ability to understand and remember simple instructions. (Id.) Dr. Leonberger opined that plaintiff had "moderate" limitations in his ability to respond appropriately to usual work situations and to

changes in a routine work setting, but mild limitations in all other areas. (Tr. 462). He explained that plaintiff had maintained social contacts and a dating relationship. (Id.)

On May 13, 2008, Dr. Anderson performed an epidural injection procedure, and diagnosed lumbar postlaminectomy syndrome, narcotic tolerance with possible symptom magnification and habituation, and chronic lumbar strain syndrome with morbid obesity. (Tr. 469-70). Dr. Anderson noted that, if plaintiff continued to require pain relievers at his present dosage regimen, a trial of spinal cord stimulation may be used. (Tr. 470). On June 3, 2008, plaintiff returned to Dr. Anderson with complaints of bilateral hip pain radiating down his legs to his knees, and wanted to discuss spinal cord stimulation surgery. (Tr. 467). Dr. Anderson sought pre-authorization from plaintiff's insurance company. (Tr. 466).

On September 11, 2008, plaintiff was seen by Dr. Raghavan. (Tr. 490). Dr. Raghavan noted that plaintiff had morbid obesity and hypertension. (Id.) Dr. Raghavan also noted that plaintiff reported erectile dysfunction and back problems, and felt that his weight was a significant factor in his medical problems. (Id.) Dr. Raghavan noted that plaintiff was otherwise doing okay and functioning as best he could. (Id.) Dr. Raghavan noted that plaintiff was calm and communicative. (Tr. 490). Dr. Raghavan noted that he had discussed bariatric "lap band" surgery with

plaintiff to aid weight reduction. (Id.) He was given Levitra[11] for erectile dysfunction, and instructed to continue taking Felodipine, and to lose weight and exercise to control diabetes, which Dr. Raghavan stated he believed plaintiff had. (Id.) Noting that plaintiff's girlfriend was a nurse, Dr. Raghavan asked that she provide him with information regarding plaintiff's calorie intake and blood pressure readings. (Id.)

Plaintiff returned to Dr. Raghavan on October 9, 2008, and it was noted he had morbid obesity, erectile dysfunction, hypertension, and sleep apnea. (Tr. 489). Dr. Raghavan also noted that plaintiff was not taking any medication, and had not yet visited a sleep laboratory for evaluation. (Id.) Plaintiff reported that he had been "going back and forth to Kansas City where his girlfriend lives," and asked Dr. Raghavan for samples of Levitra, which Dr. Raghavan did not have. (Id.) Dr. Raghavan assessed erectile dysfunction, sleep apnea, hypertension and diabetes. (Id.)

The record contains a document entitled "Medical Opinion Re: Ability To Do Work-Related Activities (Physical)" dated October 22, 2008, which plaintiff presents as being from Dr. Anderson. (Tr. 483-86). During plaintiff's administrative proceedings, this form was labeled Exhibit 13F, and was discussed during the Pre-Hearing Conference. As noted above, during the Pre-Hearing Conference, the ALJ noted that this form contained two sets of

---

[11]Levitra, or Vardenafil, is used to treat erectile dysfunction. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603035.html

handwriting, and instructed plaintiff's attorney to discuss the matter with plaintiff, after which time counsel said that plaintiff admitted having completed part of the form himself.

In the section of the form labeled "Medical Impairments," it is indicated that plaintiff has post-lumbar laminectomy syndrome, lumbar spondylosis, and spinal stenosis, obesity, depression, and hypertension. (Tr. 483). The undersigned notes that "obesity, depression and hypertension" are written in different handwriting from the other responses in this section. See (Id.) In the section of the form labeled "List your patient's symptoms, including pain, dizziness, fatigue, etc.:" it is written "Pain in lower back and down outside of both legs predominate [sic] in [right] hip and leg." (Id.) For the clinical findings and objective signs supporting the diagnoses, it is indicated that plaintiff had limited lumbar flexion and extension, and MRI findings of spinal stenosis. (Id.) It is indicated that plaintiff's impairments lasted or could be expected to last at least twelve months. (Tr. 483). It is indicated that plaintiff had the medication side effects of drowsiness and decreased motor function. (Tr. 484). His prognosis is listed as "guarded." (Id.) It is indicated that plaintiff could frequently lift and carry fewer than ten pounds, could walk fewer than fifteen to 30 minutes, and must sit or lie down to relieve pain. (Id.) It is indicated that plaintiff could sit and stand for 30 minutes, (Tr. 484), and could sit, stand/walk for less than one hour. (Tr. 485). There are checkmarks in various boxes indicating other manipulative and

-28-

postural limitations.  (Tr. 485).  It is indicated that plaintiff would need to take two to three unscheduled breaks, of 45 to 60 minutes in duration, during the workday.  (Tr. 486).  It is indicated that plaintiff's impairments would cause him to be absent more than four days per month, and that the emotional factors of anxiety and decreased attention/concentration contributed to his symptoms.  (Id.)  It is indicated that his impairments were reasonably consistent with the symptoms and functional limitations described; and that his impairments were aggravated by the following:  standing and walking for over thirty minutes; the inability to change positions every thirty minutes; and lifting, bending and twisting.  (Id.)  It is indicated that plaintiff would need to change positions every thirty minutes; that he may need frequent breaks to sit or lay down and elevate his legs, and that he may become drowsy due to pain medications and muscle relaxants.  (Id.)

Records from Caduceus Corporation Pulmonary and Sleep Medicine and St. Anthony's Medical Center indicate that plaintiff underwent sleep study in December of 2008 and was diagnosed with severe obstructive sleep apnea.  (Tr. 519-42).

On December 9, 2008, Dr. Raghavan wrote that plaintiff had multiple medical problems, including diabetes, sleep apnea, and arthritic issues.  (Tr. 487).

On February 12, 2009, Dr. Anderson wrote a letter stating that there had been no change in plaintiff's health status since the completion of the previous medical assessment on October 22,

-29-

2008.  (Tr. 514).  A second medical form entitled "Medical Opinion
Re: Ability To Do Work-Related Activities (Physical)" dated this
same day contains the same opinions and limitations expressed in
the October 22, 2008 form bearing the same title, with the
exception of the "Medical Impairments" section, which listed only
"Lumbar Post Laminectomy Syndrome with Nerve Root Injury".  (Tr.
515-18).

Records from Hughes Family Chiropractic indicate that
plaintiff was seen on June 30, 2009 in consultation for back pain.
(Tr. 544).

Records from Washington University School of Medicine,
Department of Neurological Surgery, indicate that plaintiff saw
Paul Santiago, M.D., on October 20, 2009 with complaints of low
back pain with activity.  (Tr. 550).  Plaintiff stated that he had
been unable to work for several years, and was seeking social
security disability benefits.  (Id.)  Upon examination, Dr.
Santiago noted that plaintiff was morbidly obese, and in no
apparent distress.  (Tr. 551).  Dr. Santiago noted that plaintiff
had full strength throughout, with normal muscular bulk and tone.
(Id.)  He noted that plaintiff's sensation was intact; he walked
with a slight limp to the right; and he could heel toe walk.  (Id.)
Straight leg raise testing was negative for radiculopathy, but
positive for low back pain.  (Id.)  Radiological imaging revealed
no herniation or bulging.  (Tr. 551).  Dr. Santiago diagnosed
plaintiff with lumbar spondylosis and chronic back pain, and opined
that plaintiff may benefit from surgery, but that plaintiff needed

-30-

to lose weight first. (Id.) He opined that plaintiff should not return to work, and that there was no operation that would make plaintiff pain-free. (Id.)

In a Disability Report, plaintiff averred that his symptoms first bothered him in November of 2004, and that he became unable to work due to his condition on March 1, 2005. (Tr. 173). He stated that he worked after his condition first bothered him, and that he was not currently working. (Id.)

### III.   The ALJ's Decision

The ALJ determined that plaintiff had not engaged in substantial gainful activity since March 1, 2005, the alleged onset date. (Tr. 16). The ALJ opined that plaintiff had the severe impairments of degenerative disc disease, obesity, and hypertension, and noted that plaintiff had been diagnosed with sleep apnea and diabetes. (Id.) The ALJ determined that plaintiff's dysthymic disorder/depression was non-severe. (Id.) The ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment, and that plaintiff retained the residual functional capacity (also "RFC") to perform light work with the exception that plaintiff could only occasionally bend, stoop, crouch, crawl, balance, kneel and squat, and was limited to unskilled work due to distraction from pain. (Tr. 20-21). The ALJ determined that plaintiff's RFC precluded the performance of his past relevant work as a plumber's laborer/helper. (Tr. 25). The ALJ determined that plaintiff's additional limitations had little or no effect on the occupational

-31-

base of unskilled light work, and that, considering plaintiff's
age, education and work experience and his RFC to perform the full
range of light work, the Medical-Vocational Guidelines (also
"Guidelines" or "Grids") directed a finding of "not disabled."
(Tr. 26).  The ALJ concluded that plaintiff had not been under a
disability, as defined in the Social Security Act, from March 1,
2005 through the date of the decision.

## IV.   Discussion

         To be eligible for Social Security Disability Insurance
Benefits and Supplemental Security Income under the Social Security
Act, plaintiff must prove that he is disabled.  Pearsall v.
Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary
of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The
Social Security Act defines disability as the "inability to engage
in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months."  42 U.S.C. §§
423(d)(1)(A).  An individual will be declared disabled "only if his
physical or mental impairment or impairments are of such severity
that he is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in any
other kind of substantial gainful work which exists in the national
economy."  42 U.S.C. §§ 423(d)(2)(A).

         To determine whether a claimant is disabled, the

-32-

Commissioner engages in a five-step evaluation process.  See 20
C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42
(1987).  The Commissioner begins by deciding whether the claimant
is engaged in substantial gainful activity.  If the claimant is
working, disability benefits are denied.  Next, the Commissioner
decides whether the claimant has a "severe" impairment or
combination of impairments, meaning that which significantly limits
his ability to do basic work activities.  If the claimant's
impairment(s) is not severe, then he is not disabled.  The
Commissioner then determines whether the claimant's impairments
meet or equal any of those listed in 20 C.F.R., Subpart P, Appendix
1.  If claimant's impairment(s) is equivalent to one of the listed
impairments, he is conclusively disabled.  At the fourth step, the
Commissioner establishes whether the claimant can perform his past
relevant work.  If so, the claimant is not disabled.  Finally, the
Commissioner evaluates various factors to determine whether the
claimant is capable of performing any other work in the economy.
If not, the claimant is declared disabled and becomes entitled to
disability benefits.

        The decision of the Commissioner must be affirmed if it
is supported by substantial evidence on the record as a whole.  42
U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971);
Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial
evidence is less than a preponderance but enough that a reasonable
person would find adequate to support the conclusion.  Johnson v.
Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial

-33-

evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from

-34-

the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Specifically, plaintiff claims that the ALJ failed to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on plaintiff's occupational base.  Plaintiff also contends that the ALJ failed to properly consider Listing 1.04, and failed to properly consider his subjective complaints of pain.  Plaintiff also contends that the ALJ failed to properly consider the opinions Dr. Anderson offered in his two medical source statements dated October 22, 2008 and February 12, 2009.  In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence on the record as a whole.  The undersigned will address each of plaintiff's contentions, infra.

A.    The ALJ's Consideration of Plaintiff's Pain

Plaintiff claims that the ALJ failed to properly consider his pain, and should have credited his allegations of disabling pain.  Plaintiff suggests that, if his allegations are credible, he

-35-

is limited to less than sedentary work, and would meet the requirements to qualify for DIB.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217). Where, as in the instant case, a plaintiff contends that the ALJ failed to properly consider his subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints ... under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004).

Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of his alleged impairments. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). In Polaski, the Eighth Circuit addressed this difficulty and set forth the following standard:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

> Id. at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations or upon the lack of objective medical evidence, the ALJ may discount them if there are inconsistencies in the evidence as a whole. Id.; see also Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence). The "crucial question" is not whether the claimant experiences symptoms, but whether his credible subjective complaints prevent him from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The ALJ is not required to discuss each Polaski factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff, 421 F.3d at 791); see also Samons v. Apfel, 497 F.3d 813, 820 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's

credibility determination." <u>Juszczyk v. Astrue</u>, 542 F.3d 626, 632 (8th Cir. 2008); <u>see also</u> <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005).

In the case at bar, in assessing the credibility of plaintiff's subjective complaints, the ALJ cited 20 C.F.R. § 404.1529 and Social Security Rulings (also "SSR") 96-4p and 96-7p, which correspond with <u>Polaski</u> and credibility determination. The ALJ then listed the relevant factors from <u>Polaski</u>, stating that she had considered them while assessing the credibility of plaintiff's statements. The ALJ discredited Plaintiff's allegations of symptoms precluding all work, noting several factors from the record detracting from his credibility.

The ALJ noted that plaintiff alleged that he stopped working due to his condition on March 1, 2005 but worked after that date. The ALJ's observation is consistent with the record. Plaintiff's earnings record shows earnings of $54,071.44 for the year 2006, an amount $789.04 higher than his reported earnings for 2005, the year he alleged he became disabled and stopped working on March 1. (Tr. 141). On July 18, 2006, Dr. Albanna discussed plaintiff's employment in the present tense, noting that "[h]e works as a laborer which is a high physical demand level. I told him at the present time I do not think he can meet such a demand, but he can go back to work four hours a day with 15 pounds weight

-38-

restriction to reflect his medical progress, which may not be obtainable per his employer." (Tr. 353). On May 6, 2008, plaintiff told Dr. Leonberger that he stopped working in November of 2005 because he hurt his back. (Tr. 457). While not alone dispositive, evidence that plaintiff worked after his alleged onset date (and that such work was as a laborer with high physical demand level) weighs against plaintiff's allegations of pain and other symptoms precluding all work. Dunahoo v. Apfel, 241 F.3d 1033, 1038-39 (8th Cir. 2001) (seeking work and working at a job while applying for benefits are activities inconsistent with complaints of disabling pain); Comstock v. Chater, 91 F.3d 1143, 1147 (8th Cir. 1996)(claimant's work activities during claimed disability period held inconsistent with subjective complaints).

The ALJ found that plaintiff showed improvement in terms of pain and function over time, and that Dr. Albanna felt that plaintiff's obesity was a factor in his symptoms and recovery. The ALJ noted that plaintiff did manage to lose some weight, and was considering buying an elliptical machine for weight reduction, but that plaintiff's weight loss was short-lived. Objective examinations demonstrated that, after surgery, plaintiff retained normal muscle strength and tone, normal sensation, and normal reflexes. The ALJ noted that plaintiff did not see a pain specialist until August of 2007, at which time he was observed to ambulate without assistance. Lumbar range of motion was limited, but plaintiff's examination was otherwise unremarkable, and his musculoskeletal and neurologic examinations were unchanged.

Consistent with the ALJ's observations, as noted above, plaintiff's treating physicians repeatedly reported normal neurological examinations, and repeatedly noted that plaintiff had normal muscle tone, full muscle strength, intact sensation, and/or intact reflexes. (Tr. 244, 275, 365, 364, 363, 351, 481, 551). While the lack of objective medical evidence to support the alleged symptoms is not dispositive, it is an important factor, and the ALJ is entitled to consider the fact that there is no objective medical evidence to support the degree of alleged limitations. 20 C.F.R. § 404.1529(c)(2); Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004).

Regarding plaintiff's allegations of hypertension, as the ALJ found, the record indicates that plaintiff repeatedly reported that he had stopped taking his hypertension medication, giving no good reason for doing so. "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (citing Roth v. Shalala, 45 F.3d 279, 282 (8th Cir.1995) (quoting Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993)). The ALJ also noted that plaintiff even denied having hypertension when he saw Dr. Anderson in August of 2007. In evaluating subjective complaints, an ALJ may consider that the claimant did not exhibit complaints regarding an alleged impairment while receiving other treatment. Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam).

In considering the credibility of plaintiff's

allegations of disabling depression, the ALJ noted that plaintiff denied depression and anxiety when he first saw Dr. Anderson. The ALJ was entitled to consider the fact that plaintiff did not consistently exhibit complaints related to depression. Id. In addition, the ALJ noted that, with the exception of Dr. Leonberger (to whom plaintiff was referred by his attorney), plaintiff never saw a mental health professional. This observation is consistent with the record, and with plaintiff's statement to Dr. Leonberger that he had never sought mental health treatment, and his hearing testimony, during which he stated that he had not sought mental health treatment before or after seeing Dr. Leonberger. The failure to seek medical assistance for alleged mental impairments contradicts allegations of a disabling condition. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

In addition, the undersigned notes that plaintiff's visit to Dr. Leonberger appears to be linked primarily to his quest to obtain benefits instead of a desire to obtain psychological treatment. During his hearing, plaintiff testified that his attorney sent him to Dr. Leonberger out of concern for his well-being after noting that plaintiff had not been as happy or as outgoing as he had previously been, and was "starting to kind of withdraw and maybe become depressed." (Tr. 48). However, in Dr. Leonberger's report, there was no mention that the referral was made out of concern over possible psychological decline. Instead, Dr. Leonberger noted that plaintiff had been referred by his attorney, and wrote, in the "Reason for Referral" section of his

report that "[t]his client was referred for a psychological evaluation in order to aid in determining possible disability due to allegations of back pain and depression." (Tr. 456). The fact that plaintiff's encounter with Dr. Leonberger appeared to be primarily disability-motivated instead of motivated by a desire to obtain treatment for a psychological condition provides further support for the ALJ's determination. Shannon v. Carter, 54 F.3d 484, 486 (8th Cir. 1995) (ALJ properly discounted claimant's subjective complaints of pain where "encounters with doctors appear to be linked primarily to his quest to obtain benefits, rather than to obtain medical treatment.") In addition, when Dr. Leonberger asked plaintiff why he could not work a full-time job, plaintiff cited his back surgeries; stated that he could hardly get around; and described his mood as "frustrated" stating that he used to be able to dig a ditch and could no longer do so. (Tr. 458). Plaintiff did not attribute his inability to work to depression.

The ALJ found that, while an agency interviewer indicated that plaintiff had trouble walking, Dr. Beyzer noted just two weeks earlier that plaintiff's neurological examination was normal, and he walked with a normal gait, and Dr. Albanna noted in July of 2006 that plaintiff walked without support, with a grossly intact station and gait. The ALJ determined that these inconsistencies eroded the credibility of plaintiff's allegations. An ALJ may discount subjective complaints if inconsistencies are apparent in the evidence as a whole. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).

-42-

The ALJ noted that plaintiff's alleged need to alternate sitting and standing was not supported by the medical evidence or by plaintiff's reported activities of daily living.  The record fails to demonstrate that plaintiff told his treating physicians of a need to alternate sitting with standing.  Also, as the ALJ noted, plaintiff's alleged social activities involved sitting and talking, and he never alleged the need to alternate sitting with standing.

Indeed, plaintiff's allegations of an essentially bedridden lifestyle are belied by the record.  Plaintiff reported that he volunteered at his Elk's Club office for one to two hours per day.  He testified that he had spent three hours walking at a festival in a park, although he alleged that this activity left him bedridden for days.  Plaintiff told several medical treatment providers that he had participated in barbecue competitions, which he once described to his physical therapists as an all-day event involving sitting and standing.  Plaintiff told Dr. Raghavan that he had not been as conscious of his weight as necessary due to his participation in these barbecue competitions.

Despite his allegations of being able to sit for only 15 to 30 minutes at a time, plaintiff told Dr. Leonberger that he tried to limit his driving to three to four hours at a time.  (Tr. 458).  In addition, on October 9, 2008, plaintiff told Dr. Raghavan that he had been driving to visit a girlfriend in Kansas City, Missouri, which is approximately 240 miles from plaintiff's home in Fenton, Missouri.  While plaintiff asked Dr. Raghavan for Levitra to help with erectile dysfunction, plaintiff did not request

-43-

medicine to help with pain or symptoms resulting from sitting and driving for such an extended period of time.   See (Tr. 489). Although daily activities alone do not disprove disability, they are a factor to be considered in evaluating subjective complaints. Polaski, 739 F.2d 1320; see also Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996).   Inconsistencies between subjective complaints and daily living patterns diminish credibility.   Haley v. Massanari, 258 F.3d 742, 748 (8th Cir.  2001).

        The ALJ noted that the record contained evidence that plaintiff may have exaggerated the severity of his symptoms.   In May of 2008, Dr. Anderson diagnosed plaintiff with "Narcotic tolerance with possible symptom magnification and habituation." (Tr. 469).   An ALJ may properly consider evidence that a claimant was a malingerer or had exaggerated his symptoms.   O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

        In the case at bar, the ALJ acknowledged that plaintiff's impairments caused some degree of pain and that such pain may be distracting to plaintiff, but that plaintiff's pain was not of such severity that it precluded the performance of a limited range of work.   To account for plaintiff's experience of pain, the ALJ specifically limited plaintiff's residual functional capacity to only unskilled work due to possible distractions from pain that might affect plaintiff's attention and concentration.   The ALJ's finding was proper.   The issue in credibility determination is not whether the claimant actually experiences pain, but whether the claimant's symptoms are credible to the extent that they preclude

-44-

all substantial gainful activity. <u>Baker v. Apfel</u>, 159 F.3d 1140, 1145 (8th Cir. 1998). "The mere fact that working may cause pain or discomfort does not mandate a finding of disability." <u>Craig v. Apfel</u>, 212 F.3d 433, 436 (8th Cir. 2000) (citing <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996)); <u>see</u> <u>also</u> <u>Johnson v. Chater</u>, 108 F.3d 942, 947 (8th Cir. 1997).

Review of the ALJ's credibility determination shows that, in a manner consistent with and required by <u>Polaski</u>, she considered plaintiff's subjective complaints on the basis of the entire record before her, noted numerous inconsistencies detracting from plaintiff's credibility, and gave good reasons for her decision. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles</u>, 902 F.2d at 660. Because the ALJ listed and then considered the <u>Polaski</u> factors and gave numerous good reasons for discrediting plaintiff's subjective complaints, her decision should be upheld. <u>Hogan</u>, 239 F.3d at 962 (citing <u>Dixon v. Sullivan</u>, 905 F.2d 237, 238 (8th Cir. 1990) (where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits a claimant's complaints for good reason, the decision should be upheld)).

B.   <u>Medical-Vocational Guidelines</u>

Noting that the ALJ determined that plaintiff would be distracted from work due to pain, plaintiff claims that the ALJ erroneously failed to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on plaintiff's occupational base. Plaintiff also claims that he suffers from the

-45-

severe impairments of hypertension and obesity, which are non-exertional impairments precluding application of the Medical-Vocational Guidelines.

Residual functional capacity is defined entirely in terms of the physical ability to perform certain exertional tasks. If a claimant suffers from only exertional impairments, the Commissioner may refer to the Medical-Vocational Guidelines to conclude whether the claimant has the RFC to perform work which exists in significant numbers in the national economy. See Pearsall, 274 F.3d at 1219; Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). If a claimant has non-exertional impairments, the Guidelines generally are not controlling and cannot be used to direct a conclusion of disabled or not disabled without regard to other evidence, such as vocational testimony. Hunt v. Heckler, 748 F.2d 478, 480 (8th Cir. 1984).

The exception to this general rule is that the ALJ may rely exclusively on the guidelines even though there are non-exertional impairments if the ALJ finds, and the record supports the finding, that the non-exertional impairments do not *significantly* diminish the claimant's RFC to perform the full range of activities listed in the guidelines. Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005); Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997). In particular, "[w]hen a claimant's subjective complaints of pain 'are explicitly discredited for legally sufficient reasons articulated by the ALJ,'" the Commissioner's burden may be met by use of the Guidelines. Baker v. Barnhart, 457

-46-

F.3d 882, 894-95 (8th Cir. 2006) (quoting <u>Naber v. Shalala</u>, 22 F.3d 186, 189-90 (8th Cir. 1994) (quoting <u>Hutsell v. Sullivan</u>, 892 F.2d 747, 750 (8th Cir. 1989)).  The burden is on the ALJ to demonstrate that the use of the Guidelines is proper.  <u>Lewis v. Heckler</u>, 808 F.2d 1293, 1298 (8th Cir. 1987).

In this case, plaintiff proved that he was unable to perform his past relevant work as a plumber's helper/laborer.  The burden then shifted to the Commissioner to prove that plaintiff could perform other jobs that existed in a significant number in the national economy.   In so doing, the ALJ determined that plaintiff's additional limitations had little or no effect on the occupational base of unskilled work.  Plaintiff presents no evidence to the contrary.

Regarding plaintiff's pain, as discussed in Section IV. A. above, the ALJ acknowledged that plaintiff experienced some pain, and specifically limited plaintiff's residual functional capacity to only unskilled, light work due to possible distractions from pain, and specifically determined that plaintiff's additional limitations had little or no effect on the occupational base of unskilled light work.  As discussed, in evaluating the credibility of plaintiff's subjective complaints, the ALJ made a legally sufficient determination that plaintiff's subjective assessment of the limitations of his functional capacity, including pain, was not credible.  Plaintiff's allegations of disabling pain therefore did not preclude the ALJ's use of the Guidelines.  <u>See</u> <u>Baker</u>, 457 F.3d at 894-95 (internal citations omitted).

Plaintiff also states that his obesity and hypertension are non-exertional impairments, and that the presence of non-exertional impairments preclude the use of the Grids. As stated above, the ALJ in this case specifically noted plaintiff's obesity and hypertension, and concluded that plaintiff's additional limitations had little or no effect on the occupational base of unskilled light work. An ALJ may rely exclusively on the Guidelines where, as here, she finds, and the record supports the finding, that the claimant's non-exertional impairments do not significantly diminish his RFC to perform the full range of activities listed in the Guidelines. Ellis, 392 F.3d at 996; Lucy, 113 F.3d at 908. Indeed, the administrative record does not contain evidence supporting the conclusion that plaintiff's obesity and/or hypertension caused functional restrictions beyond those determined by the ALJ. While plaintiff was repeatedly instructed to lose weight and resume taking his hypertension medication, no doctor placed any functional restrictions on him specifically due to obesity or hypertension, and plaintiff presents no compelling evidence showing otherwise.

In addition, the ALJ imposed restrictions to account for plaintiff's pain, obesity and hypertension when she restricted plaintiff to unskilled light work and limited him to only "occasional" bending, stooping, crouching, crawling, balancing, kneeling, and squatting. Social Security Ruling 83-14 provides that the full range of light work includes the ability to at least "occasionally" bend or stoop, and that to perform substantially all

-48-

of the exertional requirements of light jobs, a person would only occasionally need to crouch.   In addition, as the Commissioner correctly notes, Social Security Ruling 85-15 provides that the ability to occasionally climb, stoop, kneel, crouch and crawl does not erode the occupational base for light work.   As stated above, use of the Medical Vocational Guidelines is precluded only if the ALJ determines that the claimant's non-exertional limitations significantly limit the range of work permitted by his exertional limitations.   Hence, despite the presence of some non-exertional limitations, because the ALJ found, and the record supports, that plaintiff's non-exertional impairments do not significantly diminish his RFC to perform the full range of activities listed in the Guidelines, vocational expert testimony was unnecessary, and the ALJ in this case properly relied upon the Guidelines to make a finding of no disability.   See Thompson v. Astrue, 226 Fed.Appx. 617, 620-21 (8th Cir. 2007) (the ALJ permissibly relied upon the Guidelines, even in the presence of alleged non-exertional impairments of obesity and pain, where the ALJ determined that the non-exertional impairments would not interfere with claimant's ability to perform the full range work contemplated by the Guidelines.)

C.   Listing 1.04

Plaintiff claims that the ALJ erred in determining that he did not meet 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04, the Listing for disorders of the spine.   In his brief, plaintiff quotes Listing 1.04A as the part relevant to his argument.   (Docket

-49-

No. 12 at page 10).

At step three, the ALJ must determine whether a claimant's impairments, when considered individually and in combination, meet or equal a listed impairment. Raney v. Barnhart, 396 F.3d 1007 (8th Cir. 2005). The determination at step three is strictly a medical determination. Cockerham v. Sullivan, 895 F.2d 492 (8th Cir. 1990). For a claimant to show that his impairment matches a listed impairment, he must show that he meets all of the specified medical criteria. Harris v. Barnhart, 356 F.3d 926, 928 (8th Cir. 2004) (citing Deckard v. Apfel, 213 F.3d 996, 997 (8th Cir. 2000)).

In order to be found disabled at step three based on Listing 1.04A, a claimant must meet or equal the following criteria:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . .
>
> 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A.

-50-

Although the ALJ in this case did not cite Listing 1.04A in her opinion, she discussed the medical evidence of record that showed that plaintiff's combination of impairments did not result in all of the specific medical findings necessary to stop the sequential evaluation process at step three. The undersigned finds no error in the ALJ's failure to specifically cite Listing 1.04. Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003); Dunahoo, 241 F.3d at 1037 (there is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as her overall conclusion is supported by the record).

Prior to step three, the ALJ exhaustively analyzed the medical evidence of record as it related to plaintiff's obesity and to his allegations of back pain, and concluded that it did not show that plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment. Substantial evidence supports her conclusion. Listing 1.04A requires motor loss demonstrated by muscle atrophy or muscle weakness as well as sensory or reflex loss and, if the lower back is involved, positive straight leg raising. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04A. As discussed in the above summary of the medical information, the evidence shows that plaintiff consistently had normal neurological examinations. His doctors repeatedly noted that he had normal muscle tone, full muscle strength, intact sensation, and/or intact reflexes. (Tr. 244, 275, 365, 364, 363, 351, 481, 551). In addition, while plaintiff may have exhibited

-51-

positive straight leg testing for low back pain (but testing was
negative for radiculopathy) when he saw Dr. Santiago in 2009, the
majority of the times straight leg raise testing was administered,
plaintiff tested negative. (Tr. 373, 245, 371, 275, 366, 365, 364,
363, 352, 351).  The fact that the medical information of record
repeatedly and consistently failed to document motor loss
demonstrated by muscle atrophy or muscle weakness along with
sensory and reflex loss precludes a finding that plaintiff meets
all of the criteria of Listing 1.04A.  For a claimant to show that
his impairment matches a listed impairment, he must show that he
meets all of the specified medical criteria.  <u>Harris</u>, 356 F.3d at
928; <u>Deckard</u>, 213 F.3d at 997.

          Plaintiff suggests that, even if he does not meet Listing
1.04A, he medically equals it with the combined effects of
degenerative disc disease, obesity, and obstructive sleep apnea.
However, it is plaintiff's burden to establish medical equivalency.
Other than the conclusory statement in his brief, he offers no
medical evidence to support his statement that the combined effect
of his impairments equaled the requirements of Listing 1.04.  In
contrast, the ALJ's decision that plaintiff's impairments, either
alone or in combination, did not equal a listed impairment is
supported by substantial medical evidence.

     D.   <u>Opinion Evidence</u>

          Characterizing Dr. Anderson as his treating surgeon,
plaintiff claims that the ALJ erred when she failed to give

-52-

controlling weight to the opinions he expressed in his October 22,
2008 and February 12, 2009 medical source statements.  Plaintiff
argues that Dr. Anderson's opinions are supported by medically
acceptable clinical and laboratory diagnostic techniques and are
not contradicted by any other medical source, and that the ALJ
improperly substituted her opinion for that of the treating
physician.

     In evaluating opinion evidence, the Regulations require
the ALJ to explain in the decision the weight given to any opinions
from treating sources, non-treating sources and non-examining
sources.  See 20 C.F.R. § 404.1527.  The Regulations provide that
more weight should be given to the opinions of treating physicians
than to other sources.  20 C.F.R. § 404.1527(d)(2).  A treating
physician's assessment of the nature and severity of a claimant's
impairments should be given controlling weight if the opinion is
well supported by medically acceptable clinical and laboratory
diagnostic techniques, and is not inconsistent with other
substantial evidence in the record.  Id.

     Opinions of treating physicians do not automatically
control in determining disability, however, inasmuch as the
Commissioner is required to evaluate the record as a whole.
Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004).  When a
treating physician's opinion is not given controlling weight, the
Commissioner must look to various factors in determining what
weight to accord the opinion.  20 C.F.R. § 404.1527(d)(2).  Such

factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. § 404.1527(d)(2). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." Id.

In her written decision, the ALJ exhaustively discussed the medical evidence of record, including Dr. Anderson's treatment records and his opinion evidence, noting that Dr. Anderson's opinion evidence reflected that plaintiff's limitations restricted him to less than sedentary work. (Tr. 23, 24). The ALJ then wrote that she was not giving Dr. Anderson's opinions controlling weight, noting that the conclusions expressed therein were unsupported by his own treatment notes and were inconsistent with the other medical evidence of record. (Tr. 23, 24). The ALJ also found that Dr. Anderson merely listed plaintiff's medical problems and vaguely referred to significant physical limitations instead of specifically outlining them. (Tr. 24).

The ALJ in this case properly explained her reasons for not giving controlling weight to Dr. Anderson's two reports suggesting plaintiff was able to perform less than sedentary work, and the record supports her conclusions. As set forth in the above summary of the medical information of record, in September of 2007,

-54-

Dr. Anderson administered an injection without complications and instructed plaintiff to return as needed, and plaintiff canceled an appointment the following month stating that he was doing "fairly well" and had initiated disability proceedings. (Tr. 476). Plaintiff called again in December of 2007 seeking a Hydrocodone prescription, and was not seen by Dr. Anderson again until the following January, at which time he requested medication refills. (Tr. 472). His next contact with Dr. Anderson was four months later, when he called seeking medication refills (Tr. 471-72), and Dr. Anderson administered an injection a week later and diagnosed lumbar postlaminectomy syndrome, narcotic tolerance *with possible symptom magnification and habituation*, and chronic lumbar strain syndrome with morbid obesity. (Tr. 469-70) (emphasis added). In June of 2008, plaintiff's physical examination was unchanged, and he rated his pain at a mere 1-2 on a ten-point scale. (Tr. 467). As the Commissioner notes, Dr. Anderson's examinations revealed subjectively decreased range of motion, but plaintiff's motor strength, tone, and strength were normal, and plaintiff rated his pain as a 1-2, indicating mild pain. These records do not support the extremely severe degree of limitations indicated in Dr. Anderson's medical source statements. Where, as here, a treating physician's opinion is inconsistent with his own treatment notes, an ALJ may properly decide to give it less than controlling weight. Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009).

Substantial evidence also supports the ALJ's conclusion that Dr. Anderson's opinions were inconsistent with the other

-55-

medical evidence of record.  As the ALJ noted, Dr. Albanna opined that plaintiff could return to work part time in July of 2006, and Dr. Beyzer opined that, while plaintiff could not return to his job as a plumber (a statement consistent with the ALJ's decision), plaintiff should avail himself of vocational rehabilitation in order to find less demanding work.  In addition, while Dr. Anderson opined that plaintiff could sit for only one hour and needed to alternate sitting and standing, plaintiff told Dr. Raghavan in October of 2008 that he was driving back and forth to Kansas City, Missouri, more than 200 miles away, to visit his girlfriend.  In addition, as stated above, plaintiff's other physicians consistently documented negative objective findings upon examination.  Where, as in this case, a treating physician's opinion is inconsistent with the balance of the medical and other evidence of record, an ALJ may properly decide to give it less than controlling weight.  Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007).

Also notable is the revelation from the Pre-Hearing Conference held before plaintiff's administrative hearing.  During the Pre-Hearing Conference, the ALJ discussed various issues with plaintiff's then-attorney, including the fact that Dr. Anderson's October 22, 2008 report bore two sets of handwriting.  After discussing the matter with plaintiff, counsel reported that plaintiff had admitted to filling out part of the form himself. Review of the ALJ's decision reveals that she properly declined to give Dr. Anderson's opinion evidence controlling weight.

-56-

Plaintiff alleges no other points of error.  Therefore, for all of the foregoing reasons, on the claims that plaintiff raises,

**IT IS HEREBY ORDERED** that the Commissioner's decision be affirmed, and Plaintiff's Complaint be dismissed with prejudice.


_Frederick R. Buckles_
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE


Dated this 22nd day of September, 2011.